Cite as 2020 Ark. App. 469

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-19-950

|  |  |  |
|---|---|---|
|  |  | **Opinion Delivered:** October 7, 2020 |
| SHELBY WOODS | | APPEAL FROM THE PULASKI |
| | APPELLANT | COUNTY CIRCUIT COURT, |
| | | THIRD DIVISION [NO. 60DR-17- |
| V. | | 179] |
| | | |
| | | HONORABLE CATHLEEN V. |
| DIANNE WOODS | | COMPTON, JUDGE |
| | APPELLEE | |
| | | REVERSED AND REMANDED ON |
| | | DIRECT APPEAL; AFFIRMED ON |
| | | CROSS-APPEAL |

**KENNETH S. HIXSON, Judge**

Appellant and Cross-Appellee Shelby Woods (Shelby) appeals from an August 20, 2019 divorce decree filed by the Pulaski County Circuit Court. On direct appeal, Shelby contends that (1) the circuit court erred by failing to award him his nonmarital property; (2) the circuit court erred by ordering him to maintain a life insurance policy for the benefit of his minor child, in an amount in excess of his total child support obligation, until his child turns twenty-one years old; and (3) the circuit court erred by awarding appellee and cross-appellant Dianne Woods (Dianne) possession of certain real property until the parties' minor child reaches the age of majority when the parties' premarital agreement requires the property to be divided equally. Dianne filed a cross-appeal, contending that the premarital

agreement is void because it lacks the required statutory formalities. We reverse and remand on direct appeal and affirm on cross-appeal.

## I. *Facts*

Shelby and Dianne were married on October 21, 1997. Each party had been married previously, and each had children from their respective marriages. At the time of the trial, Shelby was 76 years of age, and Dianne was 71 years of age. Dianne's adult daughter had a child, M.W. In 2008, when M.W. was three years of age, Shelby and Dianne adopted M.W.[1] The parties separated in January 2017.

Dianne filed her complaint for divorce on January 16, 2017, alleging general indignities as grounds for the divorce. Dianne requested that she be granted an absolute divorce, be awarded custody of M.W. subject to reasonable visitation by Shelby, be awarded child support in addition to maintenance and spousal support, and be awarded the temporary use and possession of the marital home and the furnishings contained therein. Dianne further requested that Shelby be ordered to pay her attorney's fees and court costs and that all property rights be adjudicated by the circuit court.

Shelby filed an answer and a counterclaim for divorce also alleging general indignities. He requested that the parties be awarded joint custody of their son, M.W. Shelby agreed that the parties had accumulated debt and property during the marriage that must be adjudicated, but he also alleged that the parties had various property and debt that had been acquired prior to marriage that should remain under each party's ownership,

---

[1]The exact date of M.W.'s adoption is not in the record, but it is not pertinent to the issues in this appeal.

2

control, and responsibility. Additionally, Shelby alleged that each party should be responsible for any debt incurred after the date of the parties' separation. Dianne subsequently filed an amended answer to Shelby's counterclaim for divorce, wherein she alleged that there existed a Prenuptial Agreement (sometimes referred to herein as the "premarital agreement" or "agreement") executed by the parties. However, she alleged that because she was coerced to enter into the agreement, the agreement was invalid and unenforceable.

An agreed temporary order was entered on July 7, 2017. In the agreed order, Shelby agreed to continue to pay temporary child support in the amount of $2,500 a month and M.W.'s private school tuition and fees. Dianne was granted temporary possession of the marital residence in Little Rock, and Shelby was granted temporary possession of the lake house in Hot Springs. Shelby agreed to pay some temporary spousal support in the form of paying certain utility, maintenance, taxes, insurance, and medical fees.

A trial was held on May 13, 2019. Dianne testified extensively concerning the premarital agreement and the current financial condition of the parties. Dianne testified that she had entered into a premarital agreement with Shelby on October 9, 1997. However, she stated that she thought Shelby had revoked the premarital agreement during their marriage. Dianne requested that if the premarital agreement had not been revoked, the circuit court should set aside the agreement because she was under duress when she signed the agreement. Further, she also stated the premarital agreement should be set aside because the parties had been married for over twenty years and the parties adopted her grandson late in their lives.

3

Dianne testified that she did not work during the marriage, but Shelby went back to work within a year of being married. Dianne stated that her assets decreased in value while Shelby's "exponentially increased." Dianne requested that she be granted spousal support and awarded an unequal division of property. She desired the marital home, lake house, half the proceeds of the commercial lots in Hot Springs, M.W.'s college-education account, and their country club membership to be awarded to her. Regarding the household furniture and furnishings, Dianne stated that the parties could come to an agreement regarding the division of those assets. Two exhibits listing her recollection of those assets were admitted into evidence along with Dianne's notation of whether she felt each item was marital or nonmarital.

On cross-examination, Dianne agreed that she signed the premarital agreement and that Shelby did not threaten to withhold marriage if she refused to sign it. Dianne admitted that she consulted with her own personal attorney prior to executing the premarital agreement. The premarital agreement contains her Attorney's Acknowledgment and Disclosure, which provides the following in pertinent part:

> I, John Logan Wade, Attorney at Law, . . . state that I have informed and counseled DIANNE BOYT [Woods] regarding the rights and privileges of a wife under the laws of the State of Arkansas and the effect of this agreement on those rights and privileges. Furthermore, DIANNE BOYT [Woods] has demonstrated to me that she fully understands her rights and that she fully understands the contents and legal effects of the foregoing Antenuptial Agreement.

Dianne additionally admitted that each party attached financial statements to the premarital agreement and that she had no reason to doubt the accuracy of Shelby's statement. Dianne's financial statement indicated that she had a net worth of approximately $1,500,000.

4

Regarding the characterization of certain property, Dianne testified that the Little Rock marital home, the Hot Springs lake house, the adjacent lake house lots in Hot Springs, the commercial property in Hot Springs, and the new "party barge" boat bought by Shelby using their previous "party barge" boat as a trade-in were marital property. She claimed that the timberland, her Mercedes vehicle, and her Merrill Lynch account were her nonmarital property. She did, however, acknowledge that Shelby had his own nonmarital Merrill Lynch account and that she was not claiming any interest in his vehicle or the new Little Rock lot he purchased to build a new home.

Shelby testified that the parties entered into the premarital agreement voluntarily, and Dianne never expressed any concern to him in signing it. He further denied that he ever revoked the agreement. Regarding the division of property, Shelby offered two exhibits clearly listing what he considered marital property subject to an equal division and his nonmarital property under the terms of the premarital agreement. Pertinent to this appeal, the nonmarital list included the following:

- Lot located at 27 Orle Circle, Little Rock,

- Merrill Lynch accounts,

- Regions Bank Checking account,

- Any other separate bank and trust accounts,

- Fryerwood Farm,

- Commercial lots in Hot Springs,

- Party Barge,

- 2018 GMC Yukon,

5

- Various household furnishings and other personal property located in the Parker Point residence (the lake house in Hot Springs), and

- Various household furnishings and other personal property located in the Carmel Drive residence (the marital home in Little Rock).

Finally, regarding M.W., Shelby admitted that he pays for M.W.'s education and would continue to do so as long as he was able to do so and had "final say as to his school[.]"[2] He went on to state that he was "willing, barring some catastrophic event, and if [he could] have final say, [he was] willing to pay 100% of [M.W.'s] care and support from now, all the way through college."

The premarital agreement was introduced into evidence and provides the following relevant provisions to the issues on appeal:

5. Upon Divorce. The parties hereby agree that in the event the marriage between the Bride and Groom shall end in divorce, the Bride and the Groom *shall equally divide all property interests which they have acquired in their joint names.* It is the understanding of the Bride and Groom and it is their agreement that the Bride and Groom may from time to time acquire properties in their joint names. *In addition, the Bride and Groom through the fruits of their own labor may acquire assets and property in their individual names. In the event of a divorce of the parties, all property jointly held as tenants in common, tenants by the entirety, or joint tenants with rights of survivorship shall be divided equally between the Bride and the Groom.* Funds or property accumulated during marriage shall not include any interest of one another in the plan accounts in the Plan, appreciation of assets owned by a party and acquired prior to marriage or income attributable to such property, or any asset owned individually or in trust by the Bride or Groom. It is expressly understood that Bride shall have no interest in and to any qualified retirement plan benefits (or IRA benefits) of the Groom accrued prior to or during marriage, including any earnings allocated to the account of Groom during marriage. Likewise, the Groom shall have no interest in and to any qualified retirement plan benefit or IRA of the Bride accrued prior to or during marriage, including future earnings thereon. The parties have discussed what a reasonable provision for support of one another would be in the event of a divorce. The Bride and Groom acknowledge and stipulate that they have skills and talents

---

[2]The record indicates that M.W. attends a private school, Little Rock Christian Academy.

which would enable each to be employed on a self-sufficient basis and/or they individually own or have access to assets sufficient to support themselves.

6. Household Furnishings. The Groom currently owns furniture, household furnishings, bric-a-brac, china, silver, objects of art, and miscellaneous household personal effects ("Household Furnishings") which he intends to move into the personal residence ("Marital Residence") to be acquired by the Bride and Groom. Likewise, the Bride currently owns Household Furnishings which she intends to contribute to the common household. The Groom and the Bride will each prepare a list identifying the items of Household Furnishings which they intend to contribute to their common household.

The Bride and Groom stipulate that each will continue to own as separate properties the Household Furnishings which they contribute to the common household.

. . . .

7. Purchase of Residence. The Groom currently owns a residence and the Bride currently owns a separate residence. The Groom and the Bride agree that they will enter into a contract to purchase a new residence into which they will transfer their household furnishings. *The Marital Residence will be owned by the Groom and Bride as equal tenants in common.* The Groom and Bride agree to contribute the same amounts to the purchase of the Marital Residence.

. . . .

12. Separate Property. Except as herein otherwise provided, each of the parties shall have the absolute right to manage, dispose of, or otherwise deal with any property now separately owned, or hereafter separately acquired, in any manner whatsoever.

13. Joint Tenancy Property. Real property acquired by joint tenancy during the marriage shall be divided by the statutory laws in force and effect in the State of Arkansas.

14. Disclosure of Facts. Bride and Groom acknowledge that the present approximate net worth of each has been fully disclosed one to the other pursuant to the attached Exhibit A and B, that each has given consideration to these facts, that each has had the opportunity to seek advice of independent counsel, and that each is entering into this Agreement freely and with a full understanding of its provisions.

The parties each acknowledge that he or she is, to his or her satisfaction, fully acquainted with the means and resources of the other party and each waives any right

7

to disclosure beyond that contained herein. Each of them have ascertained and weighed all the facts, conditions and circumstances likely to influence his or her judgment herein; all matters set out here as well as all questions pertinent hereto have been fully and satisfactorily explained to each of them; each has given due consideration to such matters and questions; each of them clearly understands and consents to all the provisions hereof.

Each party acknowledges that the amounts he or she is entitled to receive under this Agreement during the marriage (in respect to support, for example) or in the event of the parties' divorce or legal separation or death while the parties are married is much less than the value that might be received if the parties had not entered into this Agreement.

(Emphasis added.)

At the conclusion of the trial, the parties indicated that they anticipated they could come to some agreement regarding the division of certain personal property, and the circuit court granted the parties an additional two weeks to do so. It further instructed that the parties may submit any posttrial briefs for the circuit court's consideration. Both Dianne and Shelby filed posttrial briefs as instructed on the same date, May 28, 2019. In her posttrial brief, Dianne argued that the premarital agreement was invalid because she was under extreme duress at the time of its execution. Dianne argued that this duress was caused by the suicide of her brother, the frequent disappearances of her daughter (M.W.'s mother) for months at a time, and the pressure of predestination wedding arrangements to Barbados. She further argued that the premarital agreement was unconscionable and inequitable because the agreement does not provide for anything but an equal division of marital property, that she did not have the financial means to provide for the parties' son, and Shelby had been able to increase his net worth since he continued to work during the marriage. Finally, Dianne asked that the circuit court require Shelby to maintain life insurance for the benefit of M.W. until he reaches the age of majority.

8

In Shelby's posttrial brief, he argued that the agreement was valid and enforceable pursuant to Arkansas Code Annotated section 9-11-402. He explained that Dianne had voluntarily executed the premarital agreement, and the premarital agreement had never been amended or revoked. He further disagreed with Dianne's argument that the premarital agreement was unconscionable and alleged that Dianne could not prove any of the factors enumerated in Arkansas Code Annotated section 9-11-406 (Repl. 2015) to invalidate the agreement.

In its divorce decree, filed on August 20, 2019, the circuit court specifically made the following relevant findings:

1) Plaintiff is granted a divorce from Defendant based on the grounds in her pleadings. Corroboration was waived.

2) The parties shall share joint legal custody of their minor son, MW. Primary physical custody is vested in the Plaintiff.

. . . .

9) These parties were married on October 21, 1997 and have been separated for over eighteen months. Prior to their marriage, the parties entered into a prenuptial agreement (the "Agreement"). Plaintiff asks that I set it aside. I decline to do so for the following reasons:

A party who challenges a premarital agreement that was voluntarily executed must prove all the following factors to invalidate the agreement:

(a) the agreement was unconscionable when it was executed;

(b) before execution of the agreement, that party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(c) before execution of the agreement, that party did not voluntarily and expressly waive after consulting with legal counsel, in writing, any right

9

to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(d) before execution of the agreement, that party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

Plaintiff cannot prove any of these factors.

10) Plaintiff did not allege that the Agreement was unconscionable, nor did she present any evidence indicating that there existed a gross inequality of bargaining power or that she did not comprehend the provision in question. When she signed the Agreement and married Defendant, Plaintiff was retired and had a net worth of over $1.5 million. (Pl. Ex. 1 at 16). She was represented by able counsel, who "informed and counseled [Plaintiff] in regard to the contents and legal effect" of the Agreement, including "the rights and privileges of a wife under the laws of the State of Arkansas and the effect of this Agreement upon those rights and privileges." (Pl. Ex. 1 at 12). Plaintiff's attorney affirmed that Plaintiff "fully understands her rights and that she fully understands the contents and legal effects" of the Agreement. (Pl. Ex. 1 at 12). Accordingly, there is no evidence indicating the Agreement was unconscionable.

11) Plaintiff was well represented by able counsel at the time she signed the agreement. Defendant fully disclosed his assets to Plaintiff. Plaintiff's complaint that certain assets have appreciated in value over time must also fail because she had adequate knowledge of the assets when she signed the Agreement. The Agreement was and remains valid in all respects. Because the Agreement is valid, it controls almost all questions of property distribution and marital support.

12) The parties agree that their son was given certain bronzes and that those items are not marital property, but rather belong to their son. Unless the parties are able to agree otherwise, all other joint marital personal property shall be sold and the proceeds distributed equally between the parties. The parties must either agree to the distribution of personal property by August 30, 2019 at noon, or shall begin preparations for the sale of personal property.

13) *Each party shall maintain all insurance they currently have on their son. Defendant shall buy a life insurance policy on his own life, with the parties' son made the beneficiary, with a death benefit of $500,000. Defendant shall retain this policy until their son attains the age of 21.*

10

14) Defendant shall pay child support to Plaintiff for the benefit and support of their son in the amount of $1904.00 per month. Defendant shall also be responsible for all educational, medical, and extracurricular costs associated with MW, which are not otherwise covered by insurance or scholarship. Defendant volunteered to make these additional payments. Additionally, he is in the better financial position to be responsible for all such costs.

15) *Defendant is the owner of certain commercial lots and shall continue to own them as his sole and separate property.*

16) The parties own homes in Little Rock and in Hot Springs. Because of the prenuptial agreement controls this property division, I cannot award the Little Rock home to the Plaintiff absent an agreement from the Defendant. However, I can offer that the Plaintiff shall have the use and control of the Little Rock house so long as MW is a minor. Once MW reaches his majority, unless the parties have agreed that Plaintiff may keep the house, it shall be sold and the proceeds divided equally between the parties. Plaintiff will be solely responsible for payment of the utilities and maintenance for the home. The Hot Springs home shall be sold and the proceeds divided between the parties after payment of all costs associated with the sale. If the parties are unable to agree on the realtor for the sale of the Hot Springs house, I will choose the realtor.

(Emphasis added and footnotes omitted.) This appeal followed.[3]

## II. *Standard of Review*

On appeal, this court reviews divorce cases de novo on the record. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). Moreover, we will not reverse a circuit court's finding of fact in a divorce case unless it is clearly erroneous. *Id.* A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Chekuri v. Nekkalapudi*, 2020 Ark. 74, 593 S.W.3d 467. We

---

[3]Shelby filed a motion to modify and clarify the circuit court's rulings on September 5, 2019, pursuant to Arkansas Rule of Civil Procedure 60(a). However, our record does not reflect that the circuit court ever ruled on this motion nor did either party appeal from such a ruling. Moreover, both parties abandoned any pending but unresolved claims in their notice of appeal and notice of cross-appeal.

also give due deference to the circuit court's determination of the credibility of the witnesses and the weight to be given to their testimony. *Id.*

### III. *Premarital Agreement*

Arkansas law has long recognized the validity of premarital agreements. *Franks v. Franks*, 2018 Ark. App. 266, 548 S.W.3d 871. Parties contemplating marriage may, by agreement, fix the rights of each in the property of the other differently than established by law. *Banks v. Evans*, 347 Ark. 383, 64 S.W.3d 746 (2002). The Arkansas Premarital Agreement Act, codified at Arkansas Code Annotated sections 9–11–401 to –413 (Repl. 2015), provides that a premarital agreement is an agreement between prospective spouses made in contemplation of marriage, to be effective upon marriage. Ark. Code Ann. § 9–11–401(1). It must be in writing and signed and acknowledged by both parties, and it is enforceable without consideration. Ark. Code Ann. § 9–11–402. The parties may contract regarding, among other things, their property rights and the disposition of property upon marital dissolution, but the right of a child to support may not be adversely affected by a premarital agreement. Ark. Code Ann. § 9–11–403. A premarital agreement becomes effective upon marriage, and after marriage, a premarital agreement may be amended or revoked only by a written agreement signed by the parties. Ark. Code Ann. § 9–11–404 to –405. With regard to the enforceability of such agreements, Arkansas Code Annotated section 9–11–406 provides, in part, as follows:

> (a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
>
> (1) that party did not execute the agreement voluntarily; or

12

(2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(ii) did not voluntarily and expressly waive after consulting with legal counsel, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

Although Dianne challenged the validity of the premarital agreement at trial under section 9-11-406, i.e., that she did not execute the agreement voluntarily or that the agreement was unconscionable, the circuit court rejected her arguments and found that she failed to prove any of these elements and that the agreement was valid and enforceable.

## IV. *Dianne's Cross-Appeal*

Because the disposition of Dianne's cross-appeal would be dispositive of Shelby's issues on appeal if successful, we address it first. We initially note that Dianne has abandoned the specific arguments she pled and presented at trial as grounds for the premarital agreement to be set aside. She has abandoned her argument that she did not execute the agreement voluntarily, and she has abandoned her argument that the agreement was unconscionable. Instead, Dianne changes course and argues for the first time in her cross-appeal that the circuit court erred in finding that the premarital agreement is valid because the agreement lacks the required statutory formalities. Dianne more specifically argues that although she signed the premarital agreement and the agreement purports to be acknowledged by a notary, two of the four notary acknowledgments lack a visible notary seal on the

13

photographic copy of the agreement admitted at trial. Therefore, she claims that the circuit court should have found the premarital agreement to be invalid for this facial defect.

Our appellate courts have repeatedly held that appellants are precluded from raising arguments on appeal that were not first brought to the attention of the circuit court. *Myers v. McCall*, 2009 Ark. App. 541, 334 S.W.3d 878. Issues raised for the first time on appeal will not be considered because the circuit court never had an opportunity to rule on them. *Id*. In this case, Dianne argued below that the premarital agreement was invalid and unenforceable because it was not voluntarily entered into and that the agreement was unconscionable. Dianne never raised the issue to the circuit court that the agreement was invalid because a notary seal was not properly affixed to the document. Thus, we are precluded from reaching the merits of Dianne's cross-appeal and affirm the circuit court's findings that the premarital agreement is valid and enforceable.

V. *Shelby's Direct Appeal*

A. Shelby's Nonmarital Property

We now address Shelby's arguments on direct appeal. Shelby first argues that the circuit court erred by failing to award him his separate nonmarital property. At trial, both parties introduced exhibits that contained lists of property that each contended were his or her respective nonmarital property. Shelby listed the following property in his brief that he contends should have been awarded to him: lot located at 27 Orle Circle, Little Rock; Merrill Lynch accounts; Regions Bank checking account; Fryerwood Farm; commercial lots in Hot Springs; a party barge; a 2018 GMC Yukon and various household furnishings

14

and personal property.[4]  Dianne contested Shelby's characterization of some of this property as nonmarital.  For whatever reason, the divorce decree only specifically mentions and disposes of the commercial lots in Hot Springs.[5]  Paragraph 15 of the decree specifically states that "Defendant [Shelby] is the owner of certain commercial lots, and shall continue to own them as his sole and separate property."  Shelby argues that the circuit court's failure to designate who was entitled to the remaining list of property in the decree was error and requests that we remand for the circuit court to make further findings consistent with this opinion.  We agree.

According to Arkansas Code Annotated section 9-12-315(a)(3)(A) (Repl. 2015), "[e]very such final order or judgment shall designate the specific real and personal property to which each party is entitled."  Generally, in the absence of a premarital agreement otherwise and in accordance with Arkansas Code Annotated section 9-12-315(a)(1), at the time of entry of a divorce decree, the circuit court shall equally distribute all marital property one-half to each party unless it is determined that such a distribution would be inequitable; if the property is not divided equally, then the circuit court must state the reasons and basis for not doing so, and the basis and reasons should be recited in the order entered in the matter.  *Chambers v. Chambers*, 2017 Ark. App. 429, 527 S.W.3d 1.  All nonmarital property shall be returned to the party owning it prior to marriage unless the circuit court makes

---

[4]Neither party appeals the distribution of the other assets, and this opinion is limited to the assets listed herein.  Further, each party has specifically abandoned any pending and unresolved claims in their notices of appeal.

[5]Shelby's list includes "commercial lots in Hot Springs."  The decree only describes "commercial lots."  Neither party argues that these are not the same commercial lots.

15

another division it deems equitable, after taking into consideration the factors set forth in subsection (a)(1) and stating in writing its basis and reasons for not returning the property to the party who owned it at the time of the marriage. Ark. Code Ann. § 9–12–315(a)(2). Of course, as is the case here, parties may fix the rights of each in the property of the other differently than is established by law through the execution of a valid premarital agreement *Banks*, *supra*. The circuit court below found that the premarital agreement was valid and enforceable, and we have agreed as set forth above. Therefore, the question raised by Shelby is whether the circuit court designated the specific real and personal property to which each party was entitled in the divorce decree as required by section 9-12-315(a)(1) after it considered the terms of the premarital agreement and established law.

Here, the circuit court correctly acknowledged that the premarital agreement was valid and "controls almost all questions of property distribution and marital support." The circuit court awarded Shelby the commercial lots and stated that the lake house should be sold and that the proceeds be divided equally.[6] Finally, the circuit court stated, "[u]nless the parties are able to agree otherwise, all other joint marital personal property shall be sold and the proceeds distributed equally between the parties. The parties must either agree to the distribution of personal property by August 30, 2019 at noon, or shall begin preparations for the sale of personal property." However, the decree does not specifically mention who is entitled to the real and personal property listed in Shelby's point on appeal and as was

[6]The circuit court's disposition of the marital home is discussed in subsection C below.

presented as an exhibit to the circuit court at trial. Shelby filed a motion to modify and clarify the ruling; however, the motion was not ruled on by the circuit court.

Dianne responds that further findings are unnecessary and compares the facts of this case to those in *Friedly v. Friedly*, 2020 Ark. App. 167, 597 S.W.3d 135. We hold that *Friedly* is distinguishable. There, Adrienne Friedly, like Shelby here, argued that the circuit court erred by failing to designate some of the property as marital or nonmarital. However, the divorce decree ordered that all real property be sold and ordered the parties to walk through the marital home and to divide the personal property. The circuit court further stated that if the parties could not agree, the personal property would be sold and that the proceeds be divided. We held that there was no error because although the circuit court did not initially expressly designate the disputed property as either marital or nonmarital, the property was eventually designated as marital property in the order by its inclusion with marital assets to be sold and the proceeds divided. Unlike *Friedly*, the circuit court here only ordered the "joint marital personal property" be sold. However, it is unclear which property the circuit court designated as marital or nonmarital after applying the terms of the premarital agreement. In other words, the circuit court failed to designate the specific real and personal property to which each party is entitled. Therefore, we reverse and remand for the circuit court to make further findings consistent with this opinion in order to satisfy the mandate articulated in Arkansas Code Annotated section 9–12–315(a)(3)(A).

### B. Life Insurance Policy

Next, Shelby argues that the circuit court erred by ordering him to maintain a life insurance policy for the benefit of his minor child, in an amount in excess of his total child

support obligation, until his child turns twenty-one years old. In the divorce decree, the circuit ordered Shelby to buy and retain a life insurance policy on his own life, with M.W. made the beneficiary, with a death benefit of $500,000 until M.W. attained the age of 21. Shelby specifically argues that the court lacked authority to order him to purchase life insurance other than as a guarantee for child support payments pursuant to Arkansas Code Annotated section 9-12-312(c)(1) and that the order herein was not as a guarantee of child support. Shelby further argues that even if the court intended the purchase of life insurance to be as a guarantee for child support, the amount of life insurance and the term of the policy are excessive and improper.

A review of the record reflects that Dianne first requested the circuit court to order Shelby to purchase and retain a life insurance policy in her posttrial brief. After devoting virtually all of the brief to her arguments regarding the invalidity and unconscionability of the premarital agreement, Dianne adds the final paragraph: "*Finally, due to the age of the parties, Mrs. Woods is asking [the] Court to order Mr. Woods to maintain life insurance for the benefit of their minor son until he reaches the age of majority.*" Dianne does not set forth any justification for the life insurance other than "due to the age of the parties." Dianne did not request any particular amount of life insurance in her posttrial brief and did not allege that the life insurance policy should be required as a guarantee for child support. Further, since this issue first arose in her posttrial brief, no evidence was presented at trial regarding whether a life insurance policy was appropriate under the particular circumstances of this case.

Although the premarital agreement did not require Shelby to purchase and retain a life insurance policy, it is settled law in this state that the duty of child support cannot be

18

bartered away permanently to the detriment of the child. *Storey v. Ward*, 258 Ark. 24, 523 S.W.2d 387 (1975); Ark. Code Ann. § 9-11-403. The circuit court always retains jurisdiction and authority over child support as a matter of public policy. *McGee v. McGee*, 100 Ark. App. 1, 262 S.W.3d 622 (2007). Arkansas Code Annotated section 9-12-312(c)(1) provides that "[w]hen the order provides for payment of money for the support and care of any children, the court, *in its discretion*, may require the person ordered to make the payments to furnish and file with the clerk of the court a bond or post security or give *some other guarantee such as life insurance* in an amount and with such sureties as the court shall direct." (Emphasis added.) Moreover, we have previously upheld a circuit court's order directing a father, who was ordered to pay child support and alimony, to maintain a life insurance policy to secure both obligations. *Rudder v. Hurst*, 2009 Ark. App. 577, 337 S.W.3d 565. Therefore, we cannot agree with Shelby that the circuit court lacked the authority to require the purchase of a life insurance policy under an appropriate set of circumstances as a guarantee pursuant to section 9-12-312. However, we do agree with Shelby that the court overreached its authority based on the record herein and remand the issue for reconsideration.

Shelby further argues that, even if he was required to purchase life insurance to guarantee his child support payments, requiring a $500,000 life insurance policy was excessive because, absent extenuating circumstances, his child-support obligation would at best total $177,072. However, Shelby ignores the unspecified amount the circuit court ordered him to pay for M.W.'s education, medical, and extracurricular needs and costs in his calculation. That said, we agree with Shelby that the circuit court lacked the authority

19

to require him to retain any life insurance policy as a guarantee until M.W. turned twenty-one years old because child support under these circumstances terminates by operation of law, at the latest, at the end of the school year after the minor child reaches nineteen years of age. *See* Ark. Code Ann. § 9-14-237(a)(1).

In summary, we reverse and remand for the circuit court to reconsider this issue anew. On remand, the circuit court may reconsider whether a life insurance policy is necessary and appropriate under the particular circumstances of this case to guarantee Shelby's payments for M.W.'s care and support and if yes, the terms and amounts of any such life insurance policy as permitted under Arkansas law.

### C. Possession of the Marital Home

Finally, Shelby argues that the circuit court erred by awarding Dianne possession of the marital home until the parties' minor child reaches the age of majority when the parties' premarital agreement requires the property to be divided equally. Dianne responds that the circuit court did not err because a court is permitted to provide for "M.W.'s care and support (including maintaining his current home)" as was equitable and just under these circumstances. We agree with Shelby.

We acknowledge that we have held that a circuit court has wide discretion in awarding either party the possession of the home, and the award of possession of the home is subject to such terms as the court deems to be "equitable and just." *Gilliam v. Gilliam*, 2010 Ark. App. 137, at 9, 374 S.W.3d 108, 115; *Schumacher v. Schumacher*, 66 Ark. App. 9, 986 S.W.2d 883 (1999); *see also Hodges v. Hodges*, 27 Ark. App. 250, 770 S.W.2d 164 (1989) (holding that a chancellor's decision to grant "temporary" possession of the marital home to

20

a spouse pending sale within six months was equitable and did not require the chancellor to state its basis and reasons for doing so as required for an unequal division of marital property). However, none of those cases involved a valid premarital agreement controlling issues of property division.

Here, the parties executed an enforceable premarital agreement that governed the disposition of the marital home. Remember, parties contemplating marriage may, by agreement, fix the rights of each in the property of the other differently than established by law. *Banks*, *supra.* Further, the parties may contract regarding, among other things, their property rights and the disposition of property upon marital dissolution like Shelby and Dianne did here. Ark. Code Ann. § 9-11-403. In its decree, the circuit court even acknowledged that the premarital agreement controlled the "property division" of the marital home and that it "[could not] award the Little Rock home to [Dianne] absent an agreement from [Shelby.]"

To that end, paragraph 7 of the premarital agreement provided that Shelby and Dianne had currently owned their own separate residences at that time and that they would enter into a contract to purchase a new residence (the marital residence). "The Marital Residence will be owned by [Shelby] and [Dianne] as equal tenants in common." Further, paragraph 5 of the premarital agreement stated that "[i]n the event of a divorce, all property jointly held as tenants in common . . . shall be divided equally between [Shelby] and [Dianne.]" Clearly, the agreement contemplates that in the event of divorce, any property held by the parties as tenants in common, such as the marital residence, must be sold and the proceeds divided equally.

21

Yet, contrary to the premarital agreement, the circuit court ordered that as part of the property division, Dianne would retain exclusive "use and control" of the home as long as M.W. is a minor. The circuit court went on to state that once M.W. reached the age of majority, the home should be sold and equally divided "unless the parties have agreed that [Dianne] may keep the home[.]" The circuit court failed to cite any authority or provide any further explanation for its extended delay in dividing this marital asset in contravention of the premarital agreement. Instead, the circuit court failed to enforce the clear terms of the premarital agreement in its "property division" and granted Dianne rent-free possession of the marital home for approximately seven years.

Moreover, even if we were to hold that the circuit court had the authority to make such a decision under the provisions of the premarital agreement, we cannot say that such an award was "equitable and just" under the circumstances before us. Unlike *Gilliam*, the evidence presented at trial indicated that, in addition to her nonmarital assets which were valued at $1.5 million at the time of the execution of the premarital agreement, Dianne would receive approximately $1,000,000 as her share from the sales of the marital home and the lake house from which she could use to establish a new home for herself and M.W. Additionally, no evidence was presented that M.W. suffered from any disability necessitating him to remain in the marital home as in *Gilliam*. Because we are left with a definite and firm conviction that a mistake has been made under the circumstances of this case, we must reverse and remand the circuit court's award of the marital home and order that it be disposed of pursuant to the terms of the premarital agreement.

## D. Conclusion

In summary, concerning the items of property requested by Shelby, we reverse and remand for the circuit court to make further findings consistent with this opinion in order to satisfy the mandate articulated in Arkansas Code Annotated section 9-12-315(a)(3)(A). We reverse the circuit court's order requiring Shelby to maintain a $500,000 life insurance policy with M.W. as a beneficiary until age twenty-one and remand for the circuit court to reconsider whether a life insurance policy is necessary and appropriate under the particular circumstances of this case to guarantee Shelby's payments for M.W.'s care and support and, if yes, the terms and amounts of any such life insurance policy as permitted under Arkansas law. Finally, we reverse and remand the circuit court's decision to allow Dianne possession of the marital residence and order the residence disposed of pursuant to the premarital agreement.

Reversed and remanded on direct appeal; affirmed on cross-appeal.

HARRISON and KLAPPENBACH, JJ., agree.

*Dover Dixon Horne PLLC*, by: *Gary B. Rogers* and *Adrienne M. Griffis*, for appellant/cross-appellee.

*Cullen & Co., PLLC*, by: *Tim Cullen*, for appellee/cross-appellant.